BMC SOFTWARE, INC., Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 13–60684.

United States Court of Appeals, Fifth Circuit.

March 13, 2015.

---

**104.** *Id.*

**105.** *See generally Yates v. United States,* —— U.S. ——, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015).

Gwendolyn Johnson Samora, Lina Ginan Dimachkieh, George Matthew Gerachis, Christine L. Vaughn, Vinson & Elkins, L.L.P., Washington, DC, for Petitioner–Appellant.

Ellen Page DelSole, Esq., Trial Attorney, Jonathan S. Cohen, Kathryn Keneal-

ly, U.S. Department of Justice, Washington, DC, Daniel L. Tirnrnons, Internal Revenue Service, Dallas, TX, William J. Wilkins, Internal Revenue Service, Washington, DC, for Respondent–Appellee.

Before REAVLEY, ELROD, and SOUTHWICK, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

This case involves a decision by the Commissioner of Internal Revenue (Commissioner) to partially disallow BMC Software, Inc.'s (BMC) repatriated-dividends tax deduction under 26 U.S.C. § 965(b)(3) on the ground that subsequently created accounts receivable constituted "indebtedness" and reduced BMC's eligibility for the deduction. Because the plain text of § 965 does not support the Commissioner's interpretation, and because BMC never agreed to treat the relevant accounts receivable as indebtedness, we REVERSE.

## I.

### A.

This case involves the intersection of §§ 482 and 965 of the United States Tax Code. Foreign subsidiaries of United States-based companies often pay dividends to their United States-based parent companies. These dividends constitute taxable income for the United States-based parent company. However, rather than pay these dividends, and the accompanying taxes, many United States-based multinational corporations park large sums of earnings in accounts owned by their foreign subsidiaries. Doing so allows these corporations to avoid federal income taxes, but only insofar as the cash remains overseas.

As a temporary stimulus provision, Congress enacted § 965 of the United States Tax Code to encourage such corporations to repatriate to the United States, through dividends, the funds sitting in the accounts of their foreign subsidiaries. Accordingly, § 965 permits a one-time tax deduction in the amount of eighty-five percent of certain dividends paid by a controlled foreign corporation to its United States-based parent corporation. The relevant text of § 965 states:

> In the case of a corporation which is a United States shareholder and for which the election under this section is in effect for the taxable year, there shall be allowed as a deduction an amount equal to 85 percent of the cash dividends which are received during such taxable year by such shareholder from controlled foreign corporations.

26 U.S.C. § 965.

To prevent abuse of § 965, Congress included an exception to § 965, written into § 965(b)(3). This § 965(b)(3) exception prevents United States corporations from making loans to their foreign subsidiaries—"related parties"—to fund repatriated § 965 dividends. Such "round-tripping" would defeat Congress's purpose of inducing *fresh* investment of foreign cash into the United States. H.R.Rep. No. 108–755, at 315 (2004). The exception provides that the amount of repatriated dividends otherwise eligible for a § 965 dividends-received deduction must be reduced by the amount of any increase in related-party indebtedness between October 3, 2004 (§ 965's effective date) and the end of the taxable year in which the dividend was paid. The window between these two dates is known as the "testing period."

Section 482 of the United States Tax Code prevents a domestic corporation from artificially deflating its profits that

are subject to United States income tax by inflating the profits of its foreign subsidiaries, which are not subject to United States income tax. *See* 26 U.S.C. § 482. When a foreign subsidiary sells goods or services to its United States-based parent corporation, or vice versa, the setting of the price for those goods or services is known as "transfer pricing." Although the two parties are related, the "transfer price" should match that of an arm's length transaction. Otherwise, by inflating or deflating transfer prices, a domestic taxpaying corporation could artificially increase the profits of its foreign subsidiaries that are located in tax havens and, at the same time, artificially decrease its income subject to United States federal income tax.

To prevent such abuse, § 482 grants the Commissioner authority to adjust a corporation's transfer prices if he determines that the adjustment is necessary to "clearly reflect the income" of the related parties. § 482. When the Commissioner disagrees with the transfer prices set by a taxpaying corporation, pursuant to § 482 the corporation and Commissioner may negotiate the dispute, frequently resulting in a "transfer price closing agreement." Where the transfer price closing agreement results in an increase in taxable income, such increases are called "primary adjustments."

When a corporation makes a primary adjustment, this alters the parent's and subsidiary's income on their books, even though the cash at issue is not actually moved from the foreign subsidiary's accounts to the parent corporation's accounts. Because a primary adjustment only shifts taxable income from one related party to another—i.e., from a foreign subsidiary to its United States-based parent corporation—both entities must also make "secondary adjustments" to their cash accounts so that their taxable income and cash accounts are not imbalanced. To make the secondary adjustment both parties revise their books to show that the foreign subsidiary holds cash that, due to the primary adjustment, is now effectively owned by the United States-based parent.

## B.

We now turn to the BMC transactions. In the 2006 tax year, BMC decided to take a § 965 deduction. It did so by repatriating $721 million from its wholly-owned foreign subsidiary, BMC Software European Holding (BSEH), in the form of a cash dividend. Of this sum, roughly $709 million qualified for the § 965 dividends-received deduction, which permitted BMC to deduct eighty-five percent of that amount, $603 million, from its taxable income on its 2006 tax return.

BMC accurately reported no related-party indebtedness on its 2006 tax return. Thus, it is undisputed that at the time BSEH paid its $721 million cash dividend to BMC, the § 965(b)(3) related-party indebtedness exception had no relevance or effect.

In 2007, BMC and the Commissioner signed a transfer pricing closing agreement (Transfer Pricing Closing Agreement) to correct BMC's net overpayment for royalties from its foreign subsidiary, BSEH, which should have been taxable income retained by BMC, but in fact had been paid to BSEH. This was completely unrelated to the 2006 repatriation under § 965. In the 2007 Transfer Price Closing Agreement, BMC agreed to a primary adjustment for each tax year from 2003 to 2006, increasing its taxable income by approximately $102 million in total. Because the $102 million BMC had "overpaid" BSEH remained in the cash accounts of BSEH, BMC was also required to make secondary adjustments to conform its

books and records to reflect that fact. Pursuant to Treasury Regulation § 1.482–1(g)(3), BMC had two options in making the secondary adjustments. Under the first alternative, BMC could treat the $102 million overpayment as a deemed capital contribution from BMC to BSEH. If, thereafter, BSEH chose to repatriate the $102 million to BMC to correct the cash imbalance, that repatriation would be taxed as a dividend to BMC in the year of repatriation. Under the second alternative, also authorized by Treasury Regulation § 1.482–1(g)(3) and provided for in IRS Revenue Procedure 99–32, BMC could elect to treat the $102 million as an account receivable, payable by BSEH to BMC, with interest accruing from the date of deemed creation of the account. If, thereafter, BSEH paid the account receivable, BMC would not be taxed on the receipt of those funds. In essence, the $102 million would be treated as a loan from BMC to BSEH.

BMC elected to use this second alternative to balance its cash accounts. Pursuant to Revenue Procedure 99–32, BMC treated the $102 million "overpayment" to BSEH as a series of interest-bearing accounts receivable, one for each tax year, rather than a capital contribution. As Mr. Price, BMC's tax director and negotiator, explained the transaction, "we have now the cash in the wrong place. . . . And we want to be able to square the cash accounts, bring the cash back without any adverse tax consequences. . . . [b]ecause we have already picked up the primary adjustments in taxable income." Thus, BMC's stated goal was to put the company in the same place that it would have occupied had the primary adjustments been reflected on its original tax returns.

BMC and the Commissioner then executed another closing agreement to execute the secondary adjustment, effective as

of September 25, 2007 (99–32 Closing Agreement). The 99–32 Closing Agreement created two accounts receivable, established on November 27, 2007, and payable from BSEH to BMC, with deemed establishment dates of March 31, 2005 and March 31, 2006. The 99–32 Closing Agreement included introductory language stating that the agreement was "for federal income tax purposes." The parties also agreed that when BSEH paid off the newly created accounts receivable, such payment would be "free of the Federal income tax consequences of the secondary adjustments that would otherwise result from the primary adjustment."

In 2011, four years after the execution of the 99–32 Closing Agreement, the Commissioner issued to BMC a notice of tax deficiency in the amount of approximately $13 million for the 2006 tax year. The Commissioner asserted that the accounts receivable which BMC established pursuant to the 99–32 Closing Agreement constituted related-party indebtedness between BMC and BSEH during the relevant § 965(b)(3) testing period. This would reduce BMC's eligibility for the § 965 deduction. As a result, according to the Commissioner, BMC was required to reopen its 2006 tax return and reduce the amount of the repatriated dividends eligible for the § 965 dividends-received deduction that BMC had taken in 2006.

BMC challenged the Commissioner's position, and a short trial on the merits ensued. The tax court sustained the Commissioner's deficiency determination. Its reasoning was fourfold.

First, the tax court rejected BMC's argument that § 965 contains an intent requirement, explaining that § 965 is plain and formulaic—i.e., the dividends eligible for a deduction are to be reduced by any related-party indebtedness regardless of the underlying purpose of the debt. In

other words, a "round-tripping" motive is unnecessary. This determination is not at issue on appeal.

Second, the tax court determined that the accounts receivable established by the 99–32 Closing Agreement constituted "indebtedness" within the meaning of § 965 and existed during the relevant testing period—October 3, 2004 to March 31, 2006. Therefore, the tax court concluded that the retroactively established accounts receivable reduced the amount of BMC's 2006 § 965 dividend-received deduction.

Third, the tax court explained that its conclusion was unaltered by the language in the 99–32 Closing Agreement, which states that the payment of the accounts receivable "will be free of the Federal income tax consequences" from the secondary adjustment. The tax court reasoned that this language refers only to the tax consequences of future *repayment* of the accounts receivable, not the *establishment* of the accounts receivable themselves.

Fourth, the tax court rejected BMC's argument that the deductible amount for its 2006 § 965 dividends-received deduction should not be reduced because the accounts receivable were not actually created until 2007, after the conclusion of BMC's 2006 tax year and outside the testing period. The tax court determined that "the accounts receivable qualify as indebtedness during the testing period because [BMC] and [the Commissioner] agreed that they were established" during the testing period, albeit retroactively.

BMC then initiated this appeal.

## II.

■ "In reviewing Tax Court decisions, [we apply] the same standard as applied to district court determinations." *Rodriguez v. Comm'r*, 722 F.3d 306, 308 (5th Cir.

2013). "Findings of fact are reviewed for clear error and issues of law are reviewed *de novo.*" *Terrell v. Comm'r*, 625 F.3d 254, 258 (5th Cir.2010) (internal quotation marks omitted). Because the tax court's determination in this case presents only issues of law, the proper standard of review is *de novo.*

## III.

■ BMC makes two arguments in support of its appeal. First, BMC contends that as a question of statutory interpretation, the accounts receivable established by the 99–32 Closing Agreement did not constitute "indebtedness" within the meaning of § 965(b)(3). Second, BMC argues that it did not contractually agree, in the 99–32 Closing Agreement, that the accounts receivable would be treated as indebtedness for purposes of § 965(b)(3). We consider each of these arguments in turn.

### A.

■ "[I]n any case of statutory interpretation, we look to the plain language of the statute, reading it as a whole and mindful of the linguistic choices made by Congress." *In re Universal Seismic Assoc., Inc.*, 288 F.3d 205, 207 (5th Cir.2002) (internal citations omitted). If the language of the statute is "plain and unambiguous, it must be given effect." *Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350, 362 (5th Cir.1995).

Section 965 provides that the one-time deduction for dividends received by a U.S. taxpayer "shall be reduced by" any increase in the "amount of indebtedness" owed to any related party by the United States-based corporation paying the dividend, measured between October 3, 2004, and the end of the relevant taxable year. § 965(b)(3). The text of § 965(b)(3) specifically requires that the determination of

the final amount of indebtedness be made "as of the close of the taxable year for which the election [under § 965] is in effect." Here, the relevant taxable year is 2006, and the close of that taxable year occurred on March 31, 2006. So the relevant testing period ended on March 31, 2006.

At oral argument, the Commissioner correctly conceded that he cannot prevail on the language of the statute alone. This is because it is undisputed that, "as of the close of" BMC's 2006 taxable year, the accounts receivable did not exist. Indeed, the Commissioner's brief concedes that "[n]either party contends that a loan was made from [BMC] to BSEH during the testing period" as a factual matter. Nor could the accounts receivable have existed at that time—they were not created until after the parties executed the 99–32 Closing Agreement in 2007. *See Midkiff v. Comm'r*, 96 T.C. 724 (1991), *aff'd, Noguchi v. Comm'r*, 992 F.2d 226 (9th Cir.1993) (holding that an agreement that included payment of the purchase price plus annual interest for prior years did not give rise to retroactive indebtedness in those prior years).

The Commissioner makes much of the fact that in the 99–32 Closing Agreement, BMC agreed to backdate the accounts receivable. This is an incorrect interpretation of the testing-period requirements of § 965. The fact that the accounts receivable are backdated does nothing to alter the reality that they did not exist during the testing period. Even assuming *arguendo* that a *correction* of a prior year's accounts could create indebtedness for purposes of § 965(b)(3), that is not what happened in this case. This is not a situation in which a subsequent adjustment was made in order to accurately reflect what actually happened in the taxable year ending on March 31, 2006. Rather, with the secondary adjustments, BMC agreed to create previously non-existent accounts receivable with fictional establishment dates for the purpose of calculating accrued interest and correcting the imbalance in its cash accounts that resulted from the primary adjustment. The text of § 965(b)(3) requires that, to reduce the allowable deduction, there must have been indebtedness "as of the close of" the applicable taxable year. Because the accounts receivable were not created until 2007, BMC's § 965 deduction cannot be reduced under § 965(b)(3).

The Commissioner also argues that Notice 2005–64 § 10.06, issued in 2005, supports his position. Notice 2005–64 states that accounts such as those created under the 99–32 Closing Agreement "are to be treated as indebtedness for purposes of section 965(b)(3)." There is no basis for relying on the 2005 notice to alter our interpretation of § 965(b)(3). The Commissioner correctly conceded in his brief that Notice 2005–64 is not entitled to deference under *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). At most, the 2005 notice might be entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Under *Skidmore*, we defer to the agency only to the extent that the agency's interpretation is persuasive. *Id.* We conclude that the 2005 notice is unpersuasive for several reasons. The notice contains only a single sentence regarding the treatment of accounts receivable as indebtedness. Moreover, the treatment of accounts receivable is entirely conclusory. The notice contains no analysis or explanation. This is particularly problematic in light of the fact that the notice advocates a treatment of accounts receivable that runs counter to the plain language of § 965. Finally, the Commissioner has since changed his treatment of § 965 tax conse-

quences in closing agreements, explicitly outlining the § 965 tax consequences in such agreements. With no reasoning or analysis to support its directive, and with the Commissioner's subsequent decision to explicitly provide for § 965 tax consequences in later closing agreements, the notice is entirely unpersuasive and unworthy of deference.

■ In sum, the plain language of § 965(b)(3) does not ask, "To be or not to be?" It instead asks, "To have been or not to have been?" And the answer to this question is clear: "as of" March 31, 2006, the accounts receivable did not exist. Therefore, § 965(b)(3), by its plain language, cannot sustain the judgment of the tax court.

### B.

■ We next consider the parties' arguments over a possible alternative basis for affirmance: whether BMC nevertheless contractually agreed in the 99–32 Closing Agreement to treat the accounts receivable as indebtedness for purposes of its § 965 deduction. BMC argues that it did not, while the Commissioner takes the opposite position. In essence, this dispute presents an issue of contract interpretation. "Closing agreements are no more than contracts, and are 'governed by the rules applicable to contracts generally.' " *Long v. Comm'r*, 93 T.C. 5, 10 (1989), *aff'd*, 916 F.2d 721 (11th Cir.1990) (quoting *United States v. Lane*, 303 F.2d 1, 4 (5th Cir. 1962)). "As such, they are to be construed according to the intent of the parties as of the time of entering into the agreement. When the agreement itself is unambiguous, that intent will be inferred from the four corners of the agreement." *Long*, 93 T.C. at 10 (internal citations omitted).

The 99–32 Closing Agreement neither cites nor refers to § 965. The Commissioner primarily relies upon an introductory clause, which states that "now it is hereby determined and agreed for federal income tax purposes...." This is a boilerplate provision required by the IRS in every closing agreement. According to the Commissioner, this single phrase, "for federal income tax purposes," demonstrates that the accounts receivable—established for intercompany cashflow balancing purposes—created related-party indebtedness for all income tax purposes, including § 965. In other words, the Commissioner argues that through the boilerplate provision, the parties agreed to backdate the accounts receivable for *all* tax purposes, rather than only those tax purposes specified in the 99–32 Closing Agreement.

■ We must reject the Commissioner's expansive interpretation of the boilerplate provision because it would render much of the Agreement superfluous, and also because the Agreement's enumeration of tax consequences was exclusive. The 99–32 Closing Agreement lists the transaction's tax implications in considerable detail. Paragraph three, for example, explains the tax implications flowing from the interest payments on the accounts receivable. In similar fashion, paragraph four sets forth the parties' expectations regarding foreign tax credits that may or may not have arisen from the transaction. If the parties agreed, in the boilerplate provision, to treat the accounts receivable as retroactive indebtedness for *all* federal tax purposes, then these additional provisions would be surplusage. Moreover, where the specificity and apparent comprehensiveness of an agreement's enumeration of a category of things (here, tax implications) implies that things not enumerated are excluded, we will apply the canon *expressio unius est exclusio alterius*. See, e.g., *Gulf & Southern Transp. Co. v. Jordan*, 257 F.2d 361, 363 (5th Cir.1958); *Southern Coast Corp.*

*v. Sinclair Refining Co.,* 181 F.2d 960, 961 (5th Cir.1950). Here, the *expressio unius* canon carries great force. The parties entered into the 99–32 Closing Agreement to establish the accounts receivable, to set a fictional establishment date upon which interest would be calculated, and to set forth certain tax implications of those accounts. The Agreement lists, with specificity, several tax implications. The tax-consequence-setting function of the Agreement, coupled with the specificity of its enumeration of tax consequences, strongly implies that the Agreement excluded those tax consequences which it failed to enumerate.

Thus, applying the rule against surplusage and the *expressio unius* canon, we conclude that the plain language of the 99–32 Closing Agreement precludes the Commissioner's expansive interpretation of the Agreement's boilerplate provision, and the Agreement covers only those tax consequences that it expressly enumerates. The Agreement does not contain a term requiring that the accounts receivable be treated as indebtedness for purposes of § 965. Therefore, the Commissioner's interpretation of the 99–32 Closing Agreement is foreclosed by its plain language.

Even assuming *arguendo* that the 99–32 Closing Agreement is ambiguous as to whether the accounts receivable were backdated for all tax purposes, BMC's interpretation is compelled by the unrebutted extrinsic evidence that it offered at trial as to the parties' intent. Mr. Prince, the only witness to testify at trial, explained that BMC's purpose in entering the Agreement was to "square the cash accounts [and] bring the cash back without any adverse tax consequences." Mr. Prince further testified that BMC intended, by the Agreement, to place itself in the same position it would have occupied had it originally set the transfer prices reflected in the Agreement. This testimony tracks paragraph five of the Agreement, which states that the payment of the accounts receivable "will be free of the Federal income tax consequences of the secondary adjustments that would otherwise result from the primary adjustment...." The Commissioner did not attempt to rebut this evidence at trial. Therefore, even if the Agreement were ambiguous as to whether the accounts receivable were retroactively established for all tax purposes, uncontested evidence would require us to resolve the ambiguity in BMC's favor.

Without a foothold in the 99–32 Closing Agreement's text or in the evidence of intent presented at trial, the Commissioner is left to argue for a broad interpretive rule: that collateral tax consequences apply to retroactively dated accounts—to the same extent as if the accounts were truly in existence during the testing period— unless the taxpayer has negotiated language specifying otherwise in its 99–32 closing agreement. In support of this sweeping proposition, the Commissioner cites our decision in *Smith v. United States,* 850 F.2d 242 (5th Cir.1988), and also the tax court's decision in *Schering Corp. v. Commissioner,* 69 T.C. 579 (1978), a decision upon which the tax court relied here. The Commissioner's reliance on these cases is misplaced.

█ In *Smith,* the parties entered into a closing agreement that determined the taxpayers' losses from a particular venture but did not finally determine their tax liability, penalties, or interest for any period. *Smith,* 850 F.2d at 245. We concluded that "[t]he limited scope of the closing agreement does not make it ambiguous ... because the calculation of taxable income and the assessment of penalties and interest are provided for by law." *Id.* Here, as in *Smith,* whether the accounts receivable should be retroactively treated

as indebtedness is "provided for by law," but as our preceding discussion makes clear, the text of that law— § 965(b)(3)— requires that the accounts *not* be so-treated. *Smith* stands for the unremarkable truth that when the Commissioner and a taxpayer negotiate a closing agreement, they do so against the backdrop of established tax law (such as § 965(b)(3)). *Smith* does not in any way, however, require us to adopt an interpretation of § 965(b)(3) that runs contrary to its plain meaning. In the absence of agreement to the contrary, § 965(b)(3) provides the governing default rule, and under that statute's plain language, the accounts receivable that BMC created in 2007 do not reduce BMC's § 965 deduction because they did not exist "as of" March 31, 2006.

*Schering* is also distinguishable from the present case. In *Schering,* the tax court permitted the taxpayer to take advantage of a collateral tax consequence (foreign tax credits) not specified in a closing agreement that established accounts receivable. *Schering,* 69 T.C. at 582–84. However, unlike in this case, the collateral tax consequence flowed from the taxpayer's actual payment of the accounts receivable rather than the establishment of the accounts itself. *Id.* at 590–92. When a taxpayer enters a closing agreement to settle a factual dispute and takes actions based on that agreement, the taxpayer's actions will of course have collateral tax consequences. Here, however, BMC entered into the 99–32 Closing Agreement not to settle a factual dispute, but rather to square its cash accounts to match the primary adjustment with specified tax consequences, and reducing BMC's previously taken § 965 deduction was not one of those specified tax consequences. In addition, this case does not require us to decide the tax consequences of actions that BMC took based on the Agreement, but rather the tax consequences of the

establishment of the accounts receivable itself. Therefore, *Schering* does not lend support to the government's position.

Finally, the Commissioner argues that the nonbinding 2005 notice—which baldly declares that accounts such as those created under the 99–32 Closing Agreement "are to be treated as indebtedness for purposes of section 965(b)(3)"—supports his contractual analysis. It does not. The 2005 notice was not incorporated into or referenced by the 99–32 Closing Agreement. The Commissioner relies entirely upon the fact that Mr. Price, who testified for BMC before the tax court, testified that he was aware of the notice. This is unpersuasive. Given the sophistication of the parties and the large financial consequences at stake, we cannot conclude that BMC understood the Agreement to incorporate an uncited, unreferenced notice that would effectively deprive BMC of the very benefit that it sought to obtain through the Agreement—the avoidance of adverse tax consequences. Moreover, as we have already mentioned, the Commissioner has since changed his treatment of § 965 tax consequences in closing agreements, explicitly outlining the § 965 tax consequences in such agreements. While this is by no means dispositive, it is a strong indication that earlier 99–32 agreements in fact did not treat backdated accounts receivable as indebtedness under § 965(b)(3).

Accordingly, we hold that under the 99–32 Closing Agreement, BMC did not agree to treat the accounts receivable as "indebtedness" for purposes of § 965.

## IV.

Because we conclude that neither the text of § 965 nor the provisions of the 99–32 Closing Agreement warrant treating the accounts receivable as "indebtedness"

under § 965, we REVERSE and RENDER. Internal Revenue Service