ATTORNEYS FOR PETITIONER:
**FRANCINA A. DLOUHY**
**DANIEL R. ROY**
**JON B. LARAMORE**
FAEGRE BAKER DANIELS, LLP
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:
**GREGORY F. ZOELLER**
ATTORNEY GENERAL OF INDIANA
**ANDREW W. SWAIN**
CHIEF COUNSEL, TAX SECTION
**JESSICA E. REAGAN**
**JOHN D. SNETHEN**
DEPUTY ATTORNEYS GENERAL
Indianapolis, IN

_____

# IN THE
# INDIANA TAX COURT

**FILED**

Sep 10 2015, 10:29 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

_____

| | |
|---|---|
| RENT-A-CENTER EAST, INC., | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Cause No. 49T10-0612-TA-00106 |
| | ) |
| INDIANA DEPARTMENT OF STATE | ) |
| REVENUE, | ) |
| | ) |
| Respondent. | ) |

_____

## ORDER ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

**FOR PUBLICATION**
**September 10, 2015**

WENTWORTH, J.

Rent-A-Center East, Inc. (RAC East) challenges the Indiana Department of State Revenue's assessment of adjusted gross income tax (AGIT) for the 2003 tax year. The matter is currently before the Court on the parties' cross-motions for summary judgment. The dispositive issue is whether the Department properly determined that RAC East must file a combined income tax return with two of its corporate affiliates for

the 2003 tax year.[1]  The Court finds that the Department's determination was not proper.

## FACTS AND PROCEDURAL HISTORY

The following facts are not in dispute.  Renter's Choice, Inc. (n/k/a RAC East) was formed in 1986 to operate retail stores offering home electronics, appliances, computers, furniture, and accessories to customers under flexible rent-to-own agreements.  (See Resp't Des'g Evid., Ex. N ¶ 2, Ex. A at 4.)  In 1998, Renter's Choice acquired its largest rent-to-own competitor with the trademarks and trade names associated with the "Rent-A-Center" brand (RAC Marks), changed its name to Rent-A-Center, Inc. (RAC Inc.), and transferred the RAC Marks to its new affiliate, Advantage Companies, Inc. (Advantage).  (See Resp't Des'g Evid., Ex. N ¶ 5, Ex. A at 4.)

RAC Inc. and its affiliates subsequently reorganized their corporate structure whereby RAC Inc. assumed the name RAC East and Advantage changed its name to Rent-A-Center West, Inc. (RAC West).  (See Resp't Des'g Evid., Ex. N ¶¶ 5-6.)  In addition, two new entities were formed, Rent-A-Center Holdings, Inc. (RAC Holdings) and Rent-A-Center Texas, LP (RAC Texas).  (See Resp't Des'g Evid., Ex. N ¶ 6.)  As part of the reorganization, RAC East (f/k/a RAC Inc.) engaged an independent accounting firm to conduct a Transfer Pricing Study to determine arm's-length pricing for royalties it would pay to RAC West and management fees it would pay to RAC Texas (the Intercompany Transactions).  (See Resp't Des'g Evid., Ex. N ¶¶ 16-21, Ex. A at 1, 3.)

---

[1] Given its resolution of this issue, the Court will not address whether the Department erred in imposing negligence penalties or whether requiring RAC East to file a combined income tax return violated the Commerce Clause of the United States Constitution.  (See Pet'r Br. Supp. Mot. Summ. J. & Resp. Resp't Mot. Summ. J. at 31-32.)

During 2003, RAC East had 11,359 employees and operated 1,932 rent-to-own stores in the Midwest and eastern United States, including 106 stores in Indiana. (See Resp't Des'g Evid., Ex. N ¶¶ 3, 7.) RAC West owned and licensed the RAC Marks, operated 437 rent-to-own stores in the western United States, and employed 2,537 individuals. (See Resp't Des'g Evid., Ex. N ¶¶ 11-13.) RAC Texas operated 278 rent-to-own stores in Texas and employed 1,994 individuals, including the executive management team.[2] (See Resp't Des'g Evid., Ex. N ¶¶14-15.) RAC West and RAC Texas were not qualified to do business in Indiana, did not have any employees in Indiana, and did not own or use any of their capital, plant, or other property in Indiana. (See Resp't Des'g Evid., Ex. N ¶¶ 8, 10.)

For the 2003 tax year, RAC East filed an Indiana corporate AGIT return on a separate company basis reporting that it owed no tax. (See Resp't Confd'l Des'g Evid., Ex. J at 1-4.) The Department audited RAC East for the 2001, 2002, and 2003 tax years, proposing an additional $513,272.60 in AGIT, penalties, and interest for the 2003 tax year based on its determination that RAC East should have filed a combined income tax return with RAC West and RAC Texas (the RAC Group). (See Resp't Des'g Evid., Ex. N ¶¶ 22-25, 28, 33.) RAC East protested, and after conducting a hearing, the Department issued its final determination upholding the audit results. (See Resp't Des'g Evid., Ex. N ¶¶ 29-31.)

On December 12, 2006, RAC East initiated an original tax appeal. On March 20, 2009, the Department filed its motion for summary judgment and designated, among

---

[2]  The executive management team performed, among other things, accounting, advertising, marketing, and employee training/evaluation services for both RAC East and RAC West. (See Resp't Des'g Evid., Ex. N at Ex. A at 9-13.)

other things, its proposed assessments as evidence. On June 3, 2009, RAC East filed a cross-motion for summary judgment. On May 27, 2011, after holding a hearing, the Court granted summary judgment to RAC East stating the Department had not designated facts sufficient to make a prima facie case. See Rent-A-Center East, Inc. v. Indiana Dep't of State Revenue (RAC I), 952 N.E.2d 387, 390-92 (Ind. Tax Ct. 2011), rev'd, 963 N.E.2d 463 (Ind. 2012). The Department subsequently sought review with the Indiana Supreme Court. On March 9, 2012, the Indiana Supreme reversed this Court's decision in RAC I, explaining that "as a starter" the Department needs nothing more than its motion and "notice of proposed assessment [to] constitute a prima facie showing – sufficient to satisfy Trial Rule 56(C) – that there is no genuine issue of material fact with respect to the validity of the unpaid tax[.]" See Indiana Dep't of State Revenue v. Rent-A-Center East, Inc. (RAC II), 963 N.E.2d 463, 465-67 (Ind. 2012). Consequently, the Supreme Court remanded the case for the Court to consider the parties' motions on their merits. Id. at 467. Additional facts will be supplied as necessary.

**STANDARD OF REVIEW**

Summary judgment is proper when the designated evidence demonstrates that no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). When the Department moves for summary judgment, it makes a prima facie case that there is no genuine issue of material fact regarding the validity of an unpaid tax by properly designating its proposed assessments as evidence. RAC II, 963 N.E.2d 466-67. "The burden then shifts to the taxpayer to come forward with sufficient evidence demonstrating that there is, in

4

actuality, a genuine issue of material fact with respect to the unpaid tax." Id. at 467. Cross-motions for summary judgment do not alter this standard. Horseshoe Hammond, LLC v. Indiana Dep't of State Revenue, 865 N.E.2d 725, 727 (Ind. Tax Ct. 2007), review denied.

**LAW**

Indiana taxes the portion of a corporation's adjusted gross income that is derived from sources within Indiana. IND. CODE § 6-3-2-1(b) (2003) (amended 2004). Each corporation with Indiana adjusted gross income must report its AGIT liability on a separate company basis according to the applicable allocation and apportionment rules set forth in Indiana Code § 6-3-2-2(a)-(k) (Standard Sourcing Rules). See RAC II, 963 N.E.2d at 465; RAC I, 952 N.E.2d at 389. While separate filing is the default filing method in Indiana, in limited instances, the Department may grant prospectively or require retroactively that a taxpayer determine its AGIT liability using an alternative method to that provided by the Standard Sourcing Rules:

> If the allocation and apportionment provisions of this article do not fairly represent the taxpayer's income derived from sources within the state of Indiana, the taxpayer may petition for or the department may require, in respect to all or any part of the taxpayer's business activity, if reasonable:
>
> (1) separate accounting;
>
> (2) the exclusion of any one (1) or more factors;
>
> (3) the inclusion of one (1) or more additional factors which will fairly represent the taxpayer's income derived from sources within the state of Indiana; or
>
> (4) the employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.

IND. CODE § 6-3-2-2(l) (2003) (amended 2006) (emphasis added). This alternative

5

apportionment method, sometimes referred to as the equitable apportionment method, applies only when the use of the Standard Sourcing Rules "'works a hardship or injustice upon the taxpayer, results in an arbitrary division of income, or in other respects does not fairly attribute income to this state or other states.'" RAC II, 963 N.E.2d at 467, n.3 (quoting 45 IND. ADMIN. CODE 3.1-1-62 (2003)). The Department's authority to require an alternative apportionment method is further limited if it chooses a combined income tax return[3] as that method. See I.C. § 6-3-2-2(p).

**ANALYSIS**

In response to the Department's prima facie case that its assessments are correct, RAC East contends that the Department could not force it to file a combined income tax return because its 2003 separate return fairly reflected its Indiana source income. (See, e.g., Pet'r Br. Supp. Mot. Summ. J. & Resp. Resp't Mot. Summ. J. ("Pet'r Br.") at 21-28). In support of this position, RAC East designated its Transfer Pricing Study as evidence that its Intercompany Transactions were conducted at arm's-length rates.[4] (See Pet'r Des'g Evid., Ex. A.)

The Department, on the other hand, claims that RAC East's separate return did not fairly reflect its Indiana source income and, thus, it properly required RAC East to file a combined income tax return with its two affiliates. (See, e.g., Resp't Br. Supp. Mot. Summ. J. ("Resp't Br.") at 15.) The Department explains that three interrelated

---

[3] A "combined income tax return" is "any income tax return on which one (1) or more taxpayers report income, deductions, and credits on a combined basis with one (1) or more other entities." IND. CODE § 6-3-1-28 (2003).

[4] A transfer pricing study, done in accordance with IRC § 482 and its associated regulations, determines whether the intercompany transactions between related entities are conducted at the same cost as similar transactions with third parties, i.e., at arm's length. See generally, e.g., 26 C.F.R. § 1.482-3 (2015).

factors support its determination: 1) RAC East operates as a unitary business; 2) RAC East's Intercompany Transactions with RAC West and RAC Texas distorted its Indiana source income; and 3) RAC East earned substantial profits in 2003 that were not taxed by Indiana. (See, e.g., Resp't Br. at 15-47; Resp't Reply to [Pet'r Br.] ("Resp't Reply Br.") at 9-19, 24-34.)

## I. Unitary Business

The Department first claims that RAC East must file a combined income tax return with RAC West and RAC Texas because they operate together as a unitary business. (See Resp't Br. at 15-34.) More specifically, the Department reasons that because RAC East's separate return "cannot demonstrate the precise source of its net income[,]" only by filing a combined income tax return would RAC East capture "'the many subtle and largely unquantifiable transfers of value that take place among the components of a [unitary business].'"[5] (See Resp't Br. at 39-40 (citation omitted); Resp't Reply Br. at 8, 13-16.)

If an Indiana taxpayer is a member of a unitary group,[6] a combined return would include all of the property, income, or receipts attributable to the group's out-of-state

---

[5] In making this claim, the Department uses the terms "separate accounting" and "separate reporting" as if they are interchangeable, but they are not. (See, e.g., Resp't Br. Supp. Mot. Summ. J. ("Resp't Br.") at 18-19, 38-39; Resp't Reply to [Pet'r Br.] at 15; Hr'g Tr. at 8-10.) Indeed, separate accounting is a method for determining the geographic source of a taxpayer's income. See, e.g., Mobil Oil Corp. v. Comm'r of Taxes of Vermont, 445 U.S. 425, 438 (1980) (stating that separate geographical accounting purports to isolate the portions of income received in various states). In contrast, separate reporting refers to a type of tax return in which the taxpayer reports its income tax liability alone. See, e.g., Kohl's Dep't Stores, Inc. v. Indiana Dep't of State Revenue, 822 N.E.2d 297, 299 (Ind. Tax Ct. 2005) (discussing separate and combined income tax returns). In this case, RAC East reported its Indiana AGIT liability on a separate return and did not use separate accounting.

[6] The three indicia of a unitary business are functional integration, centralized management, and economies of scale. Allied-Signal, Inc. v. Dir., Div. of Taxation, 504 U.S. 768, 781 (1992).

7

and in-state activities in the taxpayer's apportionable tax base. See Hunt Corp. v. Dep't of State Revenue, 709 N.E.2d 766, 770 (Ind. Tax Ct. 1999). This Court has explained that combined reporting for unitary businesses is based on the premise that "'in order to avoid distortion of income, the income and apportionment factors of all the components of the unitary business must be taken into account.'" Hunt, 709 N.E.2d at 777 n.27 (emphasis and citation omitted). Thus, distortion of income, whether purposeful or not, may be inherent when a taxpayer in a unitary group files a separate rather than a combined income tax return.

Regardless of a possibility of distortion, however, Indiana's AGIT statutory framework does not require a member of a unitary group to file a combined income tax return solely because there is a unitary relationship. See generally IND. CODE § 6-3-2-1 et seq. Indeed, it is well established that filing on a separate company basis is the default method for reporting an Indiana AGIT liability. See RAC II, 963 N.E.2d at 465. Moreover, Indiana Code § 6-3-2-2 expressly states that a taxpayer may report, or the Department may require, the filing of a combined income tax return in only limited instances. See I.C. § 6-3-2-2(p)-(q); accord 45 I.A.C. 3.1-1-62. Thus, to require a taxpayer to file a combined income tax return merely because it operates as a unitary business would effectively render these two fundamental aspects of Indiana's AGIT scheme superfluous or nullities. See Chrysler Fin. Co. v. Indiana Dep't of State Revenue, 761 N.E.2d 909, 916 (Ind. Tax Ct. 2002) (stating that the Court will not presume that the legislature intended to enact a statutory provision that is superfluous, meaningless, or a nullity), review denied. Accordingly, the Court finds the Department's claim that RAC East must file a combined income tax return with its two affiliates solely

8

because it operates as a unitary business with them unpersuasive.

## II. The Intercompany Transactions

Next, the Department claims that RAC East must file a combined income tax return because its payment of royalties to RAC West and management fees to RAC Texas distorted (i.e., did not fairly reflect) its Indiana source income. (See Resp't Br. at 43.) In other words, the Department claims that much of the income earned by RAC East, some of which was attributable to Indiana according to Indiana's apportionment formula, was deducted as intercompany business expenses, reducing RAC East's Indiana taxable income to zero. See, e.g., BMC Software, Inc. v. C.I.R., 780 F.3d 669, 672 (5th Cir. 2015) (explaining that a taxpayer may artificially deflate its taxable income by manipulating the prices charged for intercompany transactions with related entities). The Department explains that RAC East's Transfer Pricing Study is not relevant to the determination of whether RAC East's Indiana source income was fairly reflected on its separate return. (See Resp't Br. at 40-44; Hr'g Tr. at 12-13.) Moreover, the Department states that RAC East's 2003 separate return could not fairly reflect its Indiana source income because RAC East's payments of royalties to RAC West lacked a valid business purpose and economic substance, and RAC East's payments of management fees to RAC Texas violated the Uniform Partnership Act. (See Resp't Br. at 36-38.)

### A. Relevance of the Transfer Pricing Study

In 2002, when RAC East and its affiliates reorganized their corporate structure, RAC East hired an independent accounting firm to conduct a Transfer Pricing Study to determine arm's-length pricing for the royalties it would pay RAC West and the

management fees it would pay RAC Texas. (See Resp't Des'g Evid., Ex N ¶¶ 17, 19.) Based on the Study, RAC East paid 3% of its revenues to RAC West for use of the RAC Marks, and RAC East paid RAC Texas a management fee consisting of all amounts that exceeded 4.5% of its total costs (i.e., product costs and operating expense), which guaranteed that RAC East earned a return of 4.5% of its total costs in 2003. (See Resp't Des'g Evid., Ex. N ¶¶ 17-21.) The Department has asked the Court to disregard the Transfer Pricing Study, explaining that it is not relevant because: 1) it concerns financial accounting, not tax, 2) it concerns federal, not Indiana law, 3) it has no binding effect on state tax authorities, 4) other jurisdictions have rejected similar studies, and 5) it is flawed. (See Resp't Br. at 40-43.)

## 1. Financial Accounting

The Department first explains that the Transfer Pricing Study is not relevant because it was "done for financial accounting purposes, not for tax accounting purposes[.]" (See Resp't Br. at 41; Hr'g Tr. at 12-13.) The Transfer Pricing Study, however, states that it was based on federal income tax law, expressly IRC § 482 and the related regulations. (See Resp't Des'g Evid., Ex. N at Ex. A at 1.) The Transfer Pricing Study states that IRC § 482 requires intercompany transactions between related or "controlled" parties to be conducted at arm's-length rates to mimic the economic behavior that would take place if the parties were unrelated. (See Resp't Des'g Evid., Ex. N, Ex. A at 18.) The Transfer Pricing Study further states that the "arm's-length standard is [one] way [that] taxing authorities endeavor to create market conditions within a related group." (Resp't Des'g Evid., Ex. N at Ex. A at 18.) Accordingly, the Department's position that the Transfer Pricing Study is not relevant because it involves

financial accounting rather than tax is unavailing.

## 2. Federal Law

Next, the Department explains that RAC East has placed entirely too much weight on the Transfer Pricing Study because it uses the arm's-length standard, a method required under IRC § 482 for evaluating intercompany transactions under federal law, not Indiana law. (See Resp't Br. at 40-41; Hr'g Tr. at 11-13.) The Department further explains that IRC § 482 redresses wholly different circumstances (i.e., combating "off-shore tax evasion by multinational corporations whose taxable income is subject to multiple international treaties") than those that concern Indiana's AGIT scheme (i.e., "fairly representing [a multi-state taxpayer's] in-state business activities within the bounds of the Commerce Clause"). (See Resp't Br. at 41.) Moreover, the Department points out that Indiana has neither adopted nor incorporated by reference IRC § 482 or any other similar statutory provision. (See Resp't Br. at 41.) These arguments are not persuasive, however, for at least two reasons.

First, IRC § 482 does not solely address federal tax evasion. Indeed, the U.S. Court of Claims has explained that IRC § 482 serves two distinct purposes because it may be applied to prevent tax evasion or to clearly reflect the income of related organizations. See Eli Lilly & Co. v. U.S., 372 F.2d 990, 999 (Ct. Cl. 1967). Both of these purposes are also important to the administration of Indiana's AGIT scheme. For example, the Legislature gave the Department the extraordinary power to change a taxpayer's adjusted gross income, even though the taxpayer calculated its tax liability in complete conformance with the Standard Sourcing Rules, if the reported income does "not fairly represent the taxpayer's income derived from sources within the state of

11

Indiana[.]"  I.C. § 6-3-2-2(l).

Second, a comparison of the text of Indiana Code § 6-3-2-2(m) with the text of IRC § 482 inescapably demonstrates their similarities.  Specifically, Indiana Code § 6-3-2-2(m) provides:

> In the case of two (2) or more organizations, trades, or businesses owned or controlled directly or indirectly by the same interest, the department shall distribute, apportion, or allocate the income derived from sources within the state of Indiana between and among those organizations, trades, or businesses in order to fairly reflect and report the income derived from sources within the state of Indiana by various taxpayers.

I.C. § 6-3-2-2(m) (2003).  In turn, IRC § 482 provides:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

I.R.C. § 482 (2003).   Accordingly, the Transfer Pricing Study does not lack relevance on this basis.

### 3.  Binding Effect

The Department also explains that the Transfer Pricing Study is not relevant because it states that it "is not binding upon the IRS, any other tax authority[,] or any court[.]"  (See Resp't Br. at 42 (citing Resp't Des'g Evid., Ex. N at Ex. A at 33).)  The binding effect of the Transfer Pricing Study, however, has no bearing on its relevance

12

for purposes of summary judgment. In this summary judgment context, the Transfer Pricing Study has been designated as evidence, and its relevance depends on whether it tends to prove or disprove that RAC East's use of a separate return fairly reflected its Indiana source income in 2003. See Ind. Evidence Rule 401 (explaining that evidence is relevant if it has any tendency to make a fact of consequence in determining the action more or less probable than it would be without the evidence). In other words, a transfer pricing study is relevant because it can serve as an objective evidentiary method for evaluating state tax issues that may arise in cross-border transactions between related organizations. Consequently, the Department's position that the Transfer Pricing Study lacks relevance because it has no binding effect is not persuasive.

### 4. Other Jurisdictions

The Department also discounts the Transfer Pricing Study's relevance on the basis that other jurisdictions have rejected these types of studies. More specifically, the Department explains that other courts have found arm's-length pricing irrelevant in determining whether the income of a taxpayer that operates as a unitary business and engages in intercompany transactions with its affiliates is fairly reflected on a separate return. (See Resp't Br. at 43-44.) The Department relies on the decisions in Eli Lilly & Company v. United States, 372 F.2d 990 (Ct. Cl. 1967) and In re The Petition of The Talbots, Inc., DTA No. 820168, 2008 WL 4294963 (N.Y. Tax. App. Trib. Mar. 22, 2007) as support for its position. (See Resp't Br. at 43-44; Resp't Notice of Additional Auth.) Neither of these cases supports the Department's position.

In Eli Lilly, the court held that a taxing official's reallocation of a taxpayer's

income under IRC § 482 was reasonable, even though the taxpayer developed an intercompany pricing policy for valid business purposes, because the taxpayer failed to prove that its sales to a related subsidiary were made at arm's-length rates. See Eli Lilly, 372 N.E.2d at 992-99. The court explained that the arm's-length standard under IRC § 482 was the proper benchmark to apply when examining whether reported income fairly reflected "true taxable income." See id. at 995-96. Contrary to the Department's claim, therefore, the Eli Lilly case indicates that evidence regarding the arm's-length standard of IRC § 482 is relevant when determining whether a taxpayer's return clearly reflects income. See id. at 995-96, 999-1000. Furthermore, the holding in Eli Lilly indicates that the taxpayer did not present a transfer pricing study to establish that its intercompany pricing policy was based on arm's-length rates. See id. at 994-95 (stating that the taxpayer's management team formulated the pricing policy), 997-98 (explaining that the taxpayer presented evidence of sales between itself and certain unrelated bulk purchasers).

In Talbots, a retailer paid royalties to its wholly-owned subsidiary for the right to use the subsidiary's trademarks. See In re Talbots, Inc., D.T.A. No. 820168, 2008 WL 4294963, at *11 ¶¶ 28-29 (N.Y. Tax. App. Trib. Mar. 22, 2007). Upon audit, the taxing official required the retailer and its subsidiary to file a combined return, which resulted in the assessment of additional tax, despite the fact that the retailer had presented a study to show that its royalty payments were made at arm's-length rates. See id., 2008 WL 4294963, at *11 ¶ 29, *13-27 ¶¶ 36-93, *30 ¶¶ 105-11. The tribunal upheld the assessment before even examining the taxpayer's study because the evidence clearly established that the transactions between the retailer and its subsidiary lacked any valid

14

business purpose or economic substance.  See id., 2008 WL 4294963, at *34-35.  The facts in this case, however, differ significantly from those in Talbots.  Here, the parties have stipulated that "RAC West and RAC Texas were formed for valid business purposes related to the operations of their businesses[.]"  (See Resp't Des'g Evid., Ex. N ¶ 9.)  Moreover, the Department did not claim that RAC East's Intercompany Transactions lacked economic substance.  (See, e.g., Resp't Br. at 43 (merely arguing that "evidence of an arm's-length fee is not automatically evidence that [RAC East's separate return] fairly represents its Indiana business activities").)

### 5.  The Flaws

Finally, the Department explains that the Transfer Pricing Study is not relevant because it used properties that were not comparable to the RAC Group in formulating the arm's-length rates for the Intercompany Transactions.  (See Resp't Br. at 42; Hr'g Tr. at 43.)  The Department, however, has not provided any further explanation, factual basis, or precedential or persuasive legal authority to support this claim.  (See, e.g., Hr'g Tr. at 43; Resp't Des'g Evid., Ex. N ¶¶ 26-27 (both indicating that the Department never attempted to examine the Transfer Pricing Study).)  Accordingly, the Department has not shown that the Transfer Pricing Study is not relevant because it is flawed.

### B.  The Royalty Payments

Next, the Department argues that RAC East has adopted a business structure that allowed it to shift its Indiana source income outside of the state by deducting its royalty payments to RAC Texas.  (See Resp't Br. at 37-38.)  More specifically, the Department explains that RAC East's payment of royalties to RAC West is an improper tax avoidance measure because RAC Texas rather than RAC West "'is responsible for

15

developing advertising and marketing strategies to create, maintain and expand the brand name for the [RAC Group.]'" (See Resp't Br. at 37-38 (quoting Resp't Des'g Evid., Ex. N, Ex. A at 15).) In support, the Department cites a case in which a court required a taxpayer to file a combined income tax return with two related subsidiaries because the evidence showed that the taxpayer's trademark "assignment and license-back transaction[s with those subsidiaries] lacked a business purpose or economic substance apart from tax avoidance." (See Resp't Br. at 37-38 (citing In re Sherwin-Williams Co. v. Tax App. Trib. of the Dep't of Taxation & Fin. of N.Y., 12 A.D.3d 112, 115-16 (N.Y. App. 2004) (indicating that both subsidiaries were run on a part-time basis by an employee inexperienced in trademark management, that the taxpayer actually managed the trademarks, and that the subsidiaries returned the royalties to the taxpayer as loans)).)

As just mentioned, the parties in this case have stipulated that RAC West and RAC Texas were formed for valid business purposes related to the operation of their businesses. See supra p.13. Furthermore, the Department has not designated evidence or offered any authority that would indicate that RAC Texas' management of the RAC brand and RAC West's ownership of the RAC Marks lacked economic substance. Moreover, the designated evidence in this case does not indicate that RAC West returned the royalty payments to RAC East by using loans or some other method. Indeed, the parties have stipulated that the Department did not study RAC East, its affiliates, or their Intercompany Transactions during the audit, proposed assessment, and administrative protest phases. (See Resp't Des'g Evid., Ex. N ¶¶ 26-27.) Accordingly, the facts in this case, unlike those in Sherwin-Williams, simply do not

16

demonstrate that RAC East's payment of royalties to RAC West were tax avoidance measures that lacked a valid business purpose or economic substance. Consequently, the Court cannot find that the Department properly collapsed RAC East's business structure into one tax entity by compelling it to file a combined income tax return on this basis.

## C. Management Fees

The Department also argues that because a portion of the Uniform Partnership Act, Indiana Code § 23-4-1-18(f), prohibits partners from receiving compensation for providing services to the partnership, RAC East, the general partner of RAC Texas, improperly used its payment of management fees to RAC Texas to reduce its Indiana AGIT liability. (See Resp't Br. at 36-37; Resp't Reply Br. at 9-10; Resp't Des'g Evid. Ex. A at 282).) Indiana Code § 23-4-1-18(f) states that "[t]he rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rule[]: . . . No partner is entitled to remuneration for acting in the partnership business, except that a surviving partner is entitled to reasonable compensation for his services in winding up the partnership affairs." IND. CODE § 23-4-1-18(f) (2003) (emphasis added). In other words, "a partner is not entitled to compensation for [the] services rendered to the partnership unless there is an agreement to the contrary." United Farm Bureau Mut. Ins. Co. v. Schult, 602 N.E.2d 173, 175 (Ind. Ct. App. 1992) (emphasis added) (citations omitted).

The designated evidence reveals that RAC East and RAC Texas executed a limited partnership agreement, but the designated portion of that agreement does not address the compensation of partners. (See Resp't Des'g Evid. Ex. A at 280, 282.)

17

Accordingly, the designated evidence does not show whether RAC East's payment of management fees to RAC Texas contravened Indiana Code § 23-4-1-18(f). Moreover, because the Department has stipulated that RAC Texas was formed for valid business purposes and that the management fee payments were made at arm's-length rates, the Court cannot conclude that RAC East used its payment of management fees to RAC Texas to avoid its Indiana AGIT liability. Thus, the Department has not shown that RAC East's payment of management fees to RAC Texas distorted its Indiana source income and necessitated the filing of a combined income tax return.

### III.    RAC East's Profits

Finally, the Department claims that RAC East's use of a separate return did not fairly reflect its Indiana source income because RAC East reported an Indiana income tax liability in the tax years before it restructured, but in 2003, post-restructuring, it reported an Indiana AGIT liability of zero and requested nearly a half-million dollar refund. (See, e.g., Resp't Reply Br. at 1-2, 17, 27-28; Resp't Des'g Evid., Ex. N ¶¶ 5-6.) Indeed, the Department points out that 2003 was a record-setting year for RAC East and the RAC Group because RAC East's Indiana property, payroll, and sales factors all increased and because the RAC Group's revenues increased 10.9% to $2.2 billion with RAC East contributing more than two-thirds of the increase. (See Resp't Br. at 23-24, 34-35 (citing Resp't Confd'l Des'g Evid. Exs. I at 2-3, J at 2-3; Resp't Des'g Evid. Ex. F).) The Department also explains that 1) the RAC Group's store base increased by 10% and Indiana ranked 9th in the nation in terms of the number of stores; 2) the RAC Group posted record earnings in the first two quarters of 2003; 3) the RAC Group's net earnings increased 22.6% between 2002 and 2003; 4) the Board of Directors declared a

5:2 stock split paid as a dividend; and 5) while the RAC Group's 2003 tax rate only decreased by 6.7% nationwide, RAC East's 2003 Indiana tax rate decreased by 100%. (See Resp't Br. at 23-24, 34-35 (citing Resp't Des'g Evid., Exs. A at 71-72, C, D, F; Resp't Confd'l Des'g Evid., Ex. L at ¶¶ 17-18).) While these facts do not facially support a taxpayer reporting a zero tax liability in any state where it does business, they do not trigger the Department's authority to combine non-resident affiliates in RAC East's Indiana return in this instance.

Initially, the difference between RAC East's 2002 and 2003 Indiana income tax liabilities may be explained because Indiana's 2002 and 2003 corporate income tax laws were amended. Specifically, prior to 2003, Indiana corporations paid the greater of the gross income tax or the AGIT, plus the supplemental net income tax. See Longmire v. Indiana Dep't of State Revenue, 638 N.E.2d 894, 896 (Ind. Tax Ct. 1994); IND. CODE § 6-2.1-1-1 to -8-10 (2002) (regarding gross income taxes); IND. CODE § 6-3-8-1 to -6 (2002) (regarding supplemental net income taxes). In 2003, however, Indiana corporations paid the AGIT only. See P.L. § 192-2002(ss), § 191 (repealing, among other things, Indiana Code sections 6-2.1 and 6-3-8). The designated evidence in this case indicates that RAC East paid gross income tax and supplemental net income tax in 2002, not AGIT. (See Resp't Confd'l Des'g Evid., Ex. I at 1-2.) Consequently, the decrease between RAC East's 2002 and 2003 Indiana income tax liabilities is not by itself sufficient to demonstrate that its use of a separate return did not fairly reflect its Indiana source income.

Second, Indiana's AGIT scheme, unlike its gross income tax scheme, allows certain deductions related to the cost of doing business. See 20 Ind. Prac., Business

19

Organizations § 51.13 (stating that "[d]eductions for cost of doing business, losses, or expenses are not allowed in computing [an] Indiana gross income tax liability"). The deductions, in turn, generally reduce the amount of taxable income. See IND. CODE § 6-3-1-3.5(b) (2003) (amended 2004) (defining "taxable income" for corporations); I.R.C. § 63 (2003). See also BLACK'S LAW DICTIONARY 475 (9th ed.) (providing that a "tax deduction" is "[a]n amount subtracted from gross income when calculating adjusted gross income, or from adjusted gross income when calculating taxable income"). The number of deductions that a taxpayer may take from year-to-year typically varies because deductions related to the operation of a business may be recurrent, like insurance, telephone, utility, or management fee expenses, while others are not, such as refinancing expenses. (Compare, e.g., Resp't Confd'l Des'g Evid., Ex. I at 15 (RAC East's 2002 deductions) with Ex. J at 13-14 (RAC East's 2003 deductions).) (See also, e.g., Pet'r Br. at 28 (explaining that RAC East incurred a one-time refinancing fee in 2003 that ultimately increased its deduction for interest that year).) Moreover, a comparison of RAC East's 2002 and 2003 deductions reveals that its 2003 expense deductions for royalties and management fees did not substantially increase the overall amount of its deductions. (Compare Resp't Confd'l Des'g Evid., Ex. I at 15 (2002 deductions) with Ex. J at 13-14 (2003 deductions).) Accordingly, the fact that RAC East reported that its 2003 Indiana AGIT liability was zero does not establish per se that its Indiana source income was not fairly reflected on its separate return.

Finally, the designated evidence does not indicate that RAC East's 2003 refund request has any bearing on whether its Indiana source income was fairly reflected on its separate return. Indeed, the designated evidence reveals that RAC East requested a

refund because it had overpaid its Indiana income tax liability by making estimated tax payments in both 2002 and the first two quarters of 2003. (See Pet'r Reply [to Resp't Reply Br.] at 19 (citing Resp't Confd'l Des'g Evid., Exs. I at 1; J at 2).) In this case, therefore, the amount of RAC East's 2003 profits, the fact that its 2003 Indiana AGIT liability was zero, and its nearly half-million dollar refund request do not show that its separate return failed to fairly reflect its Indiana source income.

## CONCLUSION

The Department has claimed that RAC East must file a combined income tax return with its affiliates because it "used Indiana's roadways to deliver . . . and offer its products to residents all over the state" and then it improperly avoided its Indiana AGIT liability by "siphon[ing ] the money it earned in Indiana to [RAC West] and [RAC Texas]." (See Hr'g Tr. at 15, 20.) While the Court is aware that a taxpayer may use its business structure and transfer pricing policies to lower its state income tax liability, the evidence designated in this case simply does not indicate that RAC East has engaged in any improper tax avoidance measures. See, e.g., Carmax Auto Superstores W. Coast, Inc. v. S. C. Dep't of Revenue, 767 S.E.2d 195, 200-01 (S.C. 2014) (holding that a taxing official's bald assertions and descriptions of how it recalculated a taxpayer's income tax liability failed to show that the statutory formula did not fairly represent the taxpayer's in-state business activities). Furthermore, it is undisputed that the Transfer Pricing Study established arm's-length rates for RAC East's Intercompany Transactions and that the royalty and management fee payments were consonant with the Transfer Pricing Study's rates. Moreover, the designated evidence as well as the parties' stipulations do not show that RAC East's Intercompany Transactions can be disregarded because they

21

lacked a valid business purpose or economic substance. Consequently, RAC East's 2003 separate return fairly reflected its Indiana source income. The Court, therefore, GRANTS summary judgment in favor of RAC East and AGAINST the Department.

SO ORDERED this 10th day of September 2015.

Martha Blood Wentworth, Judge
Indiana Tax Court

Distribution: Francina A. Dlouhy, Daniel R. Roy, Jon B. Laramore, Andrew W. Swain, Jessica E. Reagan, John D. Snethen.